IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

WILLIE J. KILPATRICK,      )
                           )
        Plaintiff,         )
                           )
    v.                     )        CIVIL ACTION NO. 2:11CV008-SRW
                           )                (WO)
HYUNDAI MOTOR MANUFACTURING )
ALABAMA, LLC,              )
                           )
        Defendant.         )

## MEMORANDUM OPINION AND ORDER

Plaintiff Willie J. Kilpatrick brings this employment discrimination action against his former employer, Hyundai Motor Manufacturing Alabama, LLC ("HMMA"), alleging that HMMA discriminated against him in violation of Title VII of the Civil Rights Act of 1964 by (1) failing to reasonably accommodate his sincerely held religious beliefs, which preclude work on the Sabbath; and (2) terminating his employment. (Doc. # 1). This action is presently before the court on HMMA's motion for summary judgment (Doc. # 19). Defendant's motion is due to be granted in part and denied in part.

## BACKGROUND[1]

Defendant HMMA manufactures automobiles at its facility in Montgomery. (Rose dec., ¶ 3). Plaintiff worked for HMMA from April 15, 2005, until September 3, 2009, as a

---

[1] As it is required to do, the court has viewed the evidence presented on the motion for summary judgment in the light most favorable to the plaintiff. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992). The court considers any objections not made to the use or admissibility of the evidence waived for purposes of this motion. Davis v. Howard, 561 F.2d 565, 570 (5th Cir. 1977).

"team member" in the predelivery inspection ("PDI") department, through which all automobiles pass for alignment, testing, inspection and any necessary repair before leaving the manufacturing facility.  For the two years preceding his termination, plaintiff performed glass and leak repair on front and back windshields. (Kilpatrick depo., pp. 59-70 and Exhibit 8; Davis depo., pp. 15-18).  When plaintiff first began working in glass repair, he was one of two employees with the primary job of glass repair.  He and the other employee, Reggie Williams, then each trained an additional three or four people "primarily for the job" in plaintiff's and Williams' area.  (Kilpatrick depo., pp. 73-74).

Shortly before July 2008, plaintiff began attending the Montgomery First Seventh-day Adventist Church.  Before that time, he had no problem with working on the Sabbath, which lasts from sunset on Friday to sunset on Saturday.  (Kilpatrick depo., pp. 92-95).  From October 2008 until July 2009, HMMA limited its production schedule to three or four days each week due to poor economic conditions and reduced customer demand; it did not run on Fridays.  In July 2009, HMMA began running production at full schedule, including work on Fridays and some Saturdays.  (Id., pp. 82-83; Rose dec., ¶ 6). At that time, Hyundai operated two shifts – the "Sonata" shift and the "Santa Fe" shift.  The "Sonata" and "Santa Fe" rotated approximately every three months between the night shift (beginning at 6:15 p.m.) and the day shift.  (Davis depo., pp. 12-14).  By July 2009, plaintiff believed that he could no longer work on the Sabbath.  On Wednesday, July 15, 2009, plaintiff gave a letter

to Scott Wellington requesting to have the Sabbath day off.  (Kilpatrick depo., pp. 94-99).[2,3]

The letter stated:

> TO WHOM IT MAY CONCERN:
>
> Recently I have been attending a Bible Prophecy Seminar at the Montgomery First Seventh-day Adventist Church, and through careful Bible study, have begun to observe the seventh-day Sabbath as taught by the Old and New Testament.
>
> I respectfully request to have the Sabbath day off, which begins Friday evening at sundown and ends Saturday evening at sundown.  I am not requesting this time off to have an extra day at home, or to catch up on work around the house.  These things are laid aside as the Sabbath is sacred to me, and I want to devote these hours to God.
>
> I respectfully request you make an accommodation for my religious beliefs in harmony with TITLE VII of the Civil Rights Act, and guidelines of the Equal Opportunity Commission.
>
> I will be most happy to work out an accommodation, and have the following suggestions:
>
>> 1.  Work any other *shift, on any other day*, including Sunday, as long as it would not conflict with Friday sundown to Saturday sundown.

---

[2]  The letter bears a typewritten date of September 2, 2008, and one exhibit further includes a handwritten date of July 28, 2009, with the notation "This is what I gave to Hyundai in July 28, 2009." (See Exhibit 11 to Kilpatrick depo.).  Plaintiff testified that he received the letter from his pastor in September 2008 after attending a church seminar, that the handwritten date is a mistake, and that he had to have given the letter to Wellington on Wednesday, July 15, 2012, because he was trying to get a vacation day for the Sabbath.  (Kilpatrick depo., pp. 96-98; see also Plaintiff's Exhibit 3 to Davis depo. (HMMA "Team Relations Memo" dated July 20 and stating that "On Monday, July 15, 2009 TM Willie Kilpatrick submitted a letter requesting to be off on Friday, July 17, 2009.")).

[3] Plaintiff argues that "[h]e presented the letter to his Group Leader, Charlie Davis[,]" citing Davis' deposition testimony at page 40.  (Doc. # 28, p. 5).  However, Davis testified that he did not remember seeing the letter and does not remember plaintiff asking him personally to be off work for religious reasons. (Davis depo., pp. 39-42).

2.     Work holidays at any time.

3.     Or, if you have any other suggestions, I would be most happy to discuss them. I enjoy my work and hope to be an even better and more conscientious employee as a result of my recent decisions.

(Exhibit 11 to Kilpatrick depo.)(italics in original).  Plaintiff informed his supervisor that he would not be at work on Friday, July 17, 2009, because of his religious beliefs.  He requested leave, but that leave was denied because of a more senior leave request.  (Kilpatrick depo., pp. 86-88).  On July 29, 2009, plaintiff met with Wendy Warner (the "Employment Manager" in HMMA's human resources department) and several other people from human resources. (Id., pp. 98-103; Rose depo., pp. 10-12).  Warner told plaintiff that he was free to apply for any jobs at HMMA that did not conflict with plaintiff's religious beliefs and, also, that he could request leave or use "personal" time to cover his absences.  (Kilpatrick depo., pp. 101-02).  Warner presented plaintiff with a two-page written response to his accommodation request. (Id., pp. 100-01 and Exhibit 12).  In the letter, Warner stated, *inter alia*, that allowing plaintiff to miss work on Friday evenings would require locating another team member to perform plaintiff's job and would adversely affect other team members.  Warner added:

> [T]o maintain productivity, quality, and morale and to retain Team Members, HMMA rotates all production and maintenance Team Members between the shifts every couple of months.  Working in teams is also an essential function of Team Members' jobs. HMMA's team systems is based on the belief that [] each team will become self-sustaining, require minimal management and increase productivity. All Team Members of a team rotate shifts together. Allowing a Team Member to remain on a fixed shift (*e.g.*, day shift) would undermine the team concept and would adversely affect HMMA.

(Exhibit 12 to Kilpatrick depo.).  Warner advised plaintiff to contact Delecia McIntyre about

4

open positions.  (Id.).  However, HMMA has very few "daytime-only jobs."  (Lashley depo.,
pp. 61-62, 68-69).

Plaintiff left voicemail messages for McIntyre, but she did not return his calls until
his last week of work.  At that time, she told him that there were no jobs available.  Plaintiff
also checked the "job board" for available positions.  He saw no jobs for which he was
qualified and, therefore, did not apply for any of the posted vacancies.  (Kilpatrick depo., pp.
103-04).  Plaintiff was absent from Friday night shifts throughout August 2009, without
approval, and was disciplined under HMMA's attendance policy with an informal discussion,
a formal discussion, and a "commitment" discussion.  On September 3, 2009, an HMMA
management committee met to consider plaintiff's record and the appropriate level of
discipline for his continued absences.  Sheron Rose (at that time the Senior Manager of
Human Resources) made the decision, after discussion with the committee, to terminate
plaintiff's employment; Wendy Warner signed a letter terminating plaintiff's employment
due to his poor attendance.  (Kilpatrick depo., pp. 107-16 and Exhibits 6 (pp. 7-9) and 13-16;
Rose depo., pp. 7-9, 68).

## THE SUMMARY JUDGMENT STANDARD

A party seeking summary judgment bears the initial burden of demonstrating to the
court the basis for its motion, and identifying those portions of the pleadings, depositions,
answers to interrogatories, and admissions that it believes show an absence of any genuine
issue of material fact.  Hairston v. Gainesville Publishing Co., 9 F.3d 913 (11th Cir. 1993).

For summary judgment purposes, an issue of fact is "material" if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. Matsushita Electrical Industrial Company v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The court must view the evidence, and all factual inferences properly drawn from the evidence, in the light most favorable to the nonmoving party.  Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992); Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987).  It is improper for this court to weigh conflicting evidence or make credibility determinations; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.  Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment."  Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989) (citation omitted).

> Where the moving party will bear the burden of proof at trial,
>
> that party must show affirmatively the absence of a genuine issue of material fact: it must support its motion with credible evidence . . . that would entitle it to summary judgment unless the non-moving party, in response, come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.

Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993)(quoting United States v.

Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991)(*en banc*)).

## DISCUSSION

Plaintiff asserts two claims of religious discrimination in violation of Title VII – one alleging failure to accommodate and the other alleging discriminatory termination on the basis of his religion. HMMA moves for summary judgment on both claims.

### Count I - Failure to Accommodate

To establish a *prima facie* case of failure-to-accommodate religious discrimination, a plaintiff must establish that he held a *bona fide* religious belief that conflicted with a job requirement, that he informed his employer of his belief, and that the employer terminated his employment for his failure to comply with the conflicting job requirement.  Morrissette-Brown v. Mobile Infirmary Medical Center, 506 F.3d 1317, 1321  (11th Cir. 2007).  If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to: (1) "show[] that a reasonable accommodation was afforded the employee" (Beadle v. Hillsborough County Sheriff's Department, 29 F.3d 589, 592 (11th Cir. 1994)(citing Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 68 (1986)); or (2) prove that it "is unable to reasonably accommodate [the] employee's ... religious observance or practice without undue hardship on the conduct of the employer's business" (42 U.S.C. § 2000e(j); Morrissette-Brown, 506 F.3d at 1321).  On the present motion, HMMA does not challenge plaintiff's ability to establish a *prima facie* case.  Instead, HMMA argues that it is entitled to summary judgment because: (1) it provided "reasonable accommodation opportunities" to plaintiff; or (2) granting plaintiff's

accommodation request would create an undue hardship for HMMA.  (Doc. # 20, pp. 24-32).

In Morrisette-Brown, the Eleventh Circuit noted that since Title VII does not define the phrase "reasonably accommodate" expressly, "'the precise reach of the employer's obligation to its employee is unclear under the statute and must be determined on a case-by-case basis.'"  506 F.3d at 1321-22 (quoting Beadle, 29 F.3d at 592).  The court observed, "[n]evertheless, the Supreme Court has explained that a reasonable accommodation is one that 'eliminates the conflict between employment requirements and religious practices.'" Morrissette-Brown, 506 F.3d at 1322 (citing Philbrook, 479 U.S. at 67-69 (1986)).  HMMA contends that it reasonably accommodated Kilpatrick's religious beliefs by: (1) encouraging him to apply for any open positions that would not require him to work on his Sabbath; and (2) affording him "the opportunity to use his vacation/personal days, if available under the production schedule, to cover his Friday absences."  (Doc. # 20, pp. 26-27).

As noted above, HMMA has very few daytime-only positions.  (Lashley depo., pp. 61-62, 68-69).  Plaintiff testified that he checked the job board for openings but saw no openings for which he was qualified.  He further testified that he tried to contact McIntyre "a lot of times" and that, although he left messages, she did not call him back until "[r]ight before [he] was terminated."  When she did return his call, she told him that there were no jobs available.  (Kilpatrick depo., pp. 103-05).  Charlie Davis, plaintiff's group leader, testified that he could allow two people from plaintiff's "paint repair" team of approximately thirty employees to take leave on the same day, that priority for leave is determined by seniority and by the date

on which the request for leave is submitted, and that he posted approved leave at the end of the shift on a leave calendar on the main board in the team area.  (Davis depo., pp. 10-11, 42-48).  HMMA grants three "personal" days each calendar year that an employee may schedule either ahead (if the day is available on the leave calendar) or by "call-in" on the day the employee will be absent from work.  Plaintiff had used his three personal days for 2009 in April, May and June – before HMMA resumed a full production schedule in July.  (Davis depo., pp. 46-48, 54-59 and Exhibit 4 to Davis depo. (Doc. # 27-7)).  Plaintiff testified that the vacation days he requested to observe the Sabbath were "taken."  (Kilpatrick depo., p. 102).

HMMA contends that "job posting referral is a reasonable accommodation," citing Walden v. Centers for Disease Control and Prevention, 669 F.3d 1277 (11th Cir. 2012).  (Doc. # 20, p. 26).  Defendant argues that "[t]he Walden court found that the employer met its reasonable accommodation obligation when it, *among other things*, 'encouraged its employee to seek another position in the company and provided assistance in that search.'"  Id. (citing Walden, 669 F.3d at 1294).  The Walden court noted that other positions were available but plaintiff did not apply for them.[4]  However, the court also observed that

---

[4]  The Walden opinion does not state expressly whether plaintiff was qualified for those positions.  However, it implies that the "other positions" were – like the position from which Walden was laid off – counseling jobs.  660 F.3d at 1294 (employer "laid her off because it had no counseling positions available in the Atlanta area" but "reasonably accommodated [her] when it encouraged her to obtain new employment with the company and offered her assistance"; rejecting, as irrelevant, plaintiff's argument that the employer should have considered "transfer to a non-counseling position" because the employer "was only obligated to offer her some reasonable accommodation" not "her preferred accommodation").

Walden's employer "specifically elected to lay Ms. Walden off rather than terminate her" – an election that would have allowed Walden to retain her tenure with the company if rehired within a year. (669 F.3d at 1295-96). The court stated, "By giving Ms. Walden the opportunity to remain employed with the company, 'instead of simply terminating her as an at-will employee refusing to fulfill her job responsibilities,' [the employer] provided a reasonable accommodation to Ms. Walden." Id. at 1294 (internal citation omitted).

Defendant cites Beadle v. Hillsborough County Sheriff's Department, 29 F.3d 589 (11th Cir. 1994) in support of its contention that permitting use of vacation and personal days is a reasonable accommodation.  (Doc. # 20, p. 27).  Defendant notes that, in Beadle, "the Eleventh Circuit acknowledged the employer's sufficient reasonable accommodation efforts where it, among other things, allowed the employee to request use of vacation, sick time and compensation time if he was unable to secure a shift swap.  (Id.)(citing Beadle, 29 F.3d at 591).  The employer in Beadle used a neutral rotating shift system but allowed the plaintiff to arrange shift swaps with co-workers. To assist the plaintiff in doing so, the employer provided him with a roster which included all of his co-worker's schedules, and also allowed him to advertise his need for shift swaps on the employer's bulletin board and during daily roll calls. 29 F.3d at 593.

In the present case, viewing the evidence in the light most favorable to the non-movant: (1) plaintiff was terminated for excessive absenteeism upon accruing the absences required under HMMA's attendance policy to render him subject to termination, even though

ow the

the policy permits consideration of the particular circumstances in determining whether to impose corrective action (see Kilpatrick depo. at pp. 100-16 and Exhibit 6 (pp. 7-10), Exhibit 13 (8/10/09 "informal discussion"), Exhibit 14 (8/18/09 "formal discussion), Exhibit 15 (8/25/09 "commitment discussion") and Exhibit 16 (9/3/09 termination letter); (2) HMMA encouraged plaintiff to contact Delecia McIntyre for assistance in finding another position that would not conflict with his Sabbath observance, but HMMA has "very few" such positions (Exhibit 12 to Kilpatrick depo; Lashley depo., pp. pp. 61-62, 68-69); and (3) McIntyre did not return plaintiff's calls until his final week of work, right before he was terminated (Kilpatrick depo., pp. 101-04, 109, 121) and after he was already subject to termination for his August 28, 2009 absence.[5]  There is nothing in the record to suggest that HMMA took any affirmative steps (as the employer did in Beadle) or granted plaintiff any exception at all (as the employer did in Walden) in an attempt to accommodate plaintiff's need to observe his Sabbath. Thus, the court cannot conclude, on the present record, that HMMA's suggestions that plaintiff look for other jobs that would not conflict with his Sabbath and that he attempt to take leave or personal days constitute a reasonable accommodation as a matter of law.  See Berry v. MeadWestvaco Packaging Systems, LLC, 2011 WL 867218, *5-6 (M.D. Ala. Mar. 14, 2011)(rejecting employer's contention that allowing voluntary shift swaps and allowing the plaintiff to use his vacation time constituted reasonable accommodation under Eleventh Circuit precedent; finding the existence of "at

---

[5]  Plaintiff's final work week began on August 31, 2009. (See Exhibits 15 and 16 to Kilpatrick depo.).

11

least an issue of fact" where the "accommodations did not eliminate [the plaintiff's] work-religion conflict to any major extent" because the employee tried unsuccessfully to arrange shift swaps and had "far too little" vacation time to comply with both his religious and work requirements).  Accordingly, defendant is not entitled to summary judgment on this basis and the court turns to the issue of undue hardship.

As noted above, the employer bears the burden of proving that it "is unable to reasonably accommodate [the] employee's ... religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). Thus, on the present motion, HMMA must present evidence affirmatively establishing that reasonable accommodation would have caused HMMA undue hardship.  See Fitzpatrick, 2 F.3d at 1115. "The Supreme Court has ... generally defin[ed] "undue hardship" as "any act that would require an employer to bear greater than a 'de minimis cost' in accommodating an employee's religious beliefs." Beadle, 29 F.3d at 592 (citing Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 75 (1977)).  In arguing that the evidence establishes undue hardship, HMMA first points to Warner's July 29, 2012, response to the plaintiff's accommodation request, arguing that Warner's response "identified numerous legitimate operations issues which fully explained why Kilpatrick's request to be absent on Friday evenings and Saturdays would cause an undue hardship on HMMA." (Doc. # 20 at pp. 29-30)(citing Exhibit 12 to Kilpatrick depo.).  As plaintiff contends, however, Warner's letter does not constitute competent proof that the operations issues she identifies in the letter exist in fact.

(See Doc. # 28, pp. 10-11).

HMMA next argues that plaintiff admitted in his deposition "that he held a specialized skill position and was only one (1) of two (2) individuals who regularly performed glass repair on his shift" and that "his level of training far exceeded those of others in his department." (Doc. # 30, p. 30)(citing plaintiff's deposition at pp. 73-74, 142-43). The cited testimony is not precisely as HMMA argues. Plaintiff testified that "it started out being [plaintiff's and Reggie Williams'] primary job and them we had to train some people. And I believe I trained probably three or four people and Reggie probably trained three or four people." (Kilpatrick depo., pp. 73-74). He further testified, "Those are the people we trained primarily for the job that was in our area and occasionally they would send people down from other areas off the line to help us." (Id.) He testified that the latter employees had not been "specifically trained in glass and leak repair" and that they were working under the direction of plaintiff or Williams. (Id.). Plaintiff answered affirmatively to the question of whether his "particular job in – within PDI was a specialized job" and, also, to the question, "And there were only a handful of people within the department who had the level of training that you did to do glass and leak repair?" (Id. at pp. 142-43). Contrary to HMMA's argument, assistant manager Prestridge testified that, during the relevant time period, there were four to six employees working in glass repair on each shift. These employees did not have differing jobs within glass repair but performed their glass repair work on a "next car in" basis. (Prestridge depo., pp. 40-41). The court cannot adopt HMMA's interpretation of

13

plaintiff's testimony as it must, instead, view the evidence in the light most favorable to the plaintiff.

HMMA further contends that it constitutes an undue hardship as a matter of law to have to cover plaintiff's absence with a less-skilled operator, as HMMA would be required to do since no "floater" in PDI had the specific skills to fill in at glass repair.  HMMA cites Berry, *supra*, for its finding of undue hardship where the employer would have to substitute an "assistant operator" for an "operator."  (Doc. # 30, p. 30)(citing Prestridge depo. at p. 41 and Davis depo. at p. 28).  However, the question of undue hardship is fact specific. The Berry court was not faced with the question of whether it constitutes an undue hardship to substitute a less-skilled but *qualified* employee for Berry.  Instead, the employer had a policy allowing employees to "'swap with another person, as long as that person held the same position that they did.  They could not swap with someone of a lesser position.  The reason for that being is because the person in the lower position would not be qualified[.]'"  Berry, 2011 WL 867218 at *7 (quoting testimony).  Assistant operators were permitted to fill in for operators only in emergency circumstances. (Id.).  The Berry court cited evidence that "assistant operators are not really qualified to be gluing operators" on the plaintiff's line and the testimony of the particular assistant operator proposed by plaintiff for a swap that "he had to get additional training before he could become an operator, and that, in the few situations where he had filled in for an operator in the past, he had some trouble doing the job."  Id. at *6.  The court reasoned, "When an employer is required to replace a trained worker *with an*

*untrained* one, and the employer presents evidence that this replacement will cause inefficiencies and product quality problems, that is more than a de minimis cost." Id. at * 7 (emphasis added); see also id. at n. 8 ("[I]t is not a mere 'hypothetical hardship' to require an employer to replace a qualified worker *with an unqualified one on a regular basis*, when the employer presents testimony of how and why this will harm the employer's business.")(emphasis added).  In the present case, there is evidence that plaintiff is one of the most skilled of the employees qualified to perform glass repair.  However, the testimony cited by defendant suggests that HMMA would cover an absence in glass repair with other employees who "do a good job."  However, HMMA would have another employee who is "very good at that job" "check behind them" and "kind of make sure that glass was right[.]" (Davis depo., pp. 26-28)  In his deposition, group leader Davis declined to agree that these employees "would just not do [the job] as well as either Reggie or Willie." (Id.). While Davis and Prestridge testified that the PDI "floater" employee would not be qualified to perform the glass repair job, Davis also testified that the "floater" could, however, fill in on other positions for employees pulled to perform glass repair.  (Davis depo., pp. 28-29;  Prestridge depo. at p. 41).  As this testimony demonstrates, Berry is not on point.

To avoid the conflict with his Sabbath, plaintiff offered to work any other shift on any other day. (Exhibit 11 to Kilpatrick depo.). There is evidence of record that when glass repair was not completed by one shift, it would be completed on the next shift. (Davis depo., pp. 25-26; see also Prestridge depo., p. 49).  As noted above, Prestridge testified that there were

four to six employees working in glass repair on each shift, and that these employees performed their glass repair work on a "next car in" basis.  (Prestridge depo., pp. 40-41).  It is reasonable to infer from this testimony that a qualified glass repair technician could perform the requirements of the job on either the "Sonata" shift or the "Santa Fe" shift.  The law does not require that HMMA assign plaintiff to the day shift at the expense of the shift preference of other employees. (See Hardison, 432 U.S. at 80-81)("It was essential to TWA's business to require Saturday and Sunday work from at least a few employees even though most employees preferred those days off. ... There were no volunteers to relieve Hardison on Saturdays, and to give Hardison Saturdays off, TWA would have had to deprive another employee of his shift preference at least in part because he did not adhere to a religion that observed the Saturday Sabbath.  Title VII does not contemplate such unequal treatment.").  However, HMMA has not, at this stage, demonstrated that undue hardship would have resulted from authorizing plaintiff to seek *voluntary* shift swaps with any of the four to six employees working glass repair on the day shift. HMMA bears the burden of proof on the issue of undue hardship and has not established that it is entitled to summary judgment on plaintiff's accommodation claim.

Count II - Disparate Treatment/Termination

In Count II, plaintiff alleges that he "has been discriminated against because of his religion by being terminated in violation of Title VII" and that he was "terminated because of his religious beliefs and practices."  (Complaint, ¶¶ 28, 29).  Such a claim may rest on

either direct or circumstantial evidence. <u>Dixon v. The Hallmark Companies, Inc.</u>, 627 F.3d 849, 854 (11th Cir. 2010). Plaintiff does not contend that there exists any direct evidence of discrimination; he relies, instead, on circumstantial evidence. (<u>See</u> Plaintiff's brief, Doc. # 28, pp. 48-56). "When Title VII claims are supported by circumstantial evidence, [the court applies] the burden-shifting framework articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 6568 (1973)." <u>Dixon v. Palm Beach County Parks and Recreation Dept.</u>, 343 Fed. Appx. 500, 501 (11th Cir. 2009)(citing <u>Brooks v. County Commission of Jefferson County</u>, 446 F.3d 1160, 1162 (11th Cir. 2006)). To establish a *prima facie* case of discrimination under this framework, plaintiff must establish, *inter alia*, the existence of a comparator outside his protected class who was treated more favorably. <u>Dixon</u>, 343 Fed. Appx. at 501. HMMA contends that plaintiff cannot establish this element of his *prima facie* case. Plaintiff agrees that he must show that he was treated differently than a similarly-situated comparator. (Plaintiff's brief, Doc. # 28, pp. 50-52).[6] He contends, citing the deposition testimony of Sheron Rose, that "Hyundai has granted numerous

---

[6] Defendant contends that plaintiff must identify an "employee who had a similar attendance record and was not terminated." (Defendant's brief, Doc. # 20, p. 35). However, plaintiff is not bound to this precise method of establishing a *prima facie* case. Plaintiff might establish such a case as to his termination claim if he were to show that defendant's discriminatory application of its employment policies made it more difficult for the plaintiff to keep his attendance at an acceptable level (for example, by counting attendance occurrences in a discriminatory manner). <u>See Knight v. Baptist Hospital of Miami, Inc.</u>, 330 F.3d 1313, 1316 n. 4 (11th Cir. 2003)("Knight can establish a *prima facie* case based on her termination, however, if the decision to give her a decision-making day was discriminatory: the termination, which arose out of the decision-making day, would be improper as well."). Although the particular facts necessary to establish that a comparator is "similarly situated" to the plaintiff may vary, it is clear that plaintiff must demonstrate the existence of such a comparator.

exceptions to the attendance policy for Team Members who have missed work for various secular reasons." Id. at p. 51 (citing Rose depo. at pp. 66-67).  In the cited testimony, Rose stated:

> What comes to my mind when I talk about attendance or consider circumstance, catastrophic circumstances – well, I mean, whether it's, you know a major weather – we've had folk who have had storms, and if they live, you know X miles away and the road is closed or power lines down – I remember there was one storm, the Tuscaloosa area or somewhere in Birmingham, the power lines were down, *a team member couldn't get out of their neighborhood*.  Obviously, other roads were open, but the road to the neighborhood where they live was down.  They couldn't get it.  Well, that attendance wouldn't be considered – something like that wouldn't be considered when you talk about attendance corrective action.

(Rose depo., pp. 66-67)(emphasis added).  Rose's testimony is, essentially, that HMMA did not count an absence against an unidentified employee when the employee was unable to get out of his or her neighborhood due to downed power lines. Plaintiff argues that the comparator's conduct need not be exactly identical to his, but that "[w]hat is important is that the '**nature of the offenses committed and the nature of the punishment imposed**' be similar.  (Doc. # 28, p. 51)(emphasis in original).  Rose's testimony about an employee who could not get to work because of physical obstacles caused by the weather falls far short of demonstrating that the employee was similarly situated to the plaintiff, who chose for religious reasons not to appear for his Friday night shifts.

Plaintiff further argues that – while his efforts to work with the company to eliminate the work/Sabbath conflict were "shot down" – "when various employees attempted to eliminate the conflicts between their familial and other secular obligations" they were

permitted to do so "by being allowed to swap shifts with other Team Members to alleviate their conflicts." (Plaintiff's brief, Doc. # 28, p. 52)(citing Jackson depo. at pp. 26-28). Plaintiff argues that he "was not given this option, even though it would have eliminated his conflict." (Id.).

It is undisputed that HMMA – during the relevant time period – operated two production shifts (the "Santa Fe" shift and the "Sonata" shift), and that the Sonata and Santa Fe shifts rotated between day and night hours every two to three months. (See Davis depo., pp. 12-14; Lashley depo., pp. 17-18; Kilpatrick depo., pp. 57-58; Prestridge depo., pp. 21-22). In the testimony on which plaintiff relies, Barry Jackson[7] testified that he was aware of occasions in which HMMA's hardship committee had granted employees' requests to be moved to a different shift for various reasons, including: "My wife works on the opposite shift; my – you know, child care, carpool, school." Jackson stated, "There have been team members who put in a request to go to another shift and the hardship committee may say yes, they can go to another shift if there's a team member on the shift they're wanting to go to that's willing to volunteer to change with that person." He gave a negative response when asked if he recalled "any situations where people only needed to be changed on one particular day out of the week ... instead of the entire shift[.]" (Jackson depo., pp. 25-28).

In view of the evidence of record about the "Santa Fe" and "Sonata" shifts and the requirement that these production shifts rotate every two or three months between days and

---

[7] Jackson is an assistant manager in HMMA's "team relations" department, a department that works "hand in hand" with HMMA's human resources department. (Jackson depo., pp. 8, 12).

nights, the testimony cited by plaintiff does not permit a reasonable inference that HMMA allowed any other production team member to "swap" shifts with employees on the opposing shift on an "as needed" basis, or that HMMA granted any production team member leave to continue working either days or nights on a long-term basis. Plaintiff points to no evidence suggesting that the granted requests "to be moved to a different shift because of a hardship" or "to go to another shift" (see Jackson depo. at pp. 25-26) involved anything other than reassignment of the requesting employee and a volunteer employee to the opposing production shifts. Plaintiff did not ask to be "moved" to another production shift. Instead, he requested "to have the Sabbath day off, which begins Friday evening at sundown and ends Saturday evening at sundown." (Exhibit 11 to Kilpatrick depo.). The evidence cited by plaintiff does not demonstrate the existence of a similarly-situated comparator. Defendant is, accordingly, entitled to summary judgment on Count II.

<u>Motion to Strike</u>

In a motion to strike (Doc. # 29) filed with its reply brief, defendant moves to strike portions of plaintiff's declaration (Doc. # 27-1). The substance of plaintiff's declaration would not change the court's ruling on the present motion in any way and, accordingly, the court did not consider it. Thus, the court does not reach the merits of defendant's motion to strike and will deny it as moot.[8]

---

[8] The challenged declaration does not appear to bear plaintiff's signature. (See Plaintiff's Exhibits 1 and 2). Thus, it appears likely that the document does not satisfy the requirements of 28 U.S.C. § 1746 for a declaration under penalty of perjury. However, because the court will deny the motion to strike as moot, it will not require plaintiff to establish that the testimony he presents

## CONCLUSION

For the foregoing reasons, it is

ORDERED that defendant's motion to strike (Doc. # 29) is DENIED as MOOT.

It is further ORDERED that plaintiff's unopposed motion for leave to file his response in opposition to summary judgment out of time by one day (Doc. # 26) is GRANTED.

It is further ORDERED defendant's motion for summary judgment (Doc. # 19) is GRANTED as to Count II (the disparate treatment/termination claim) and DENIED as to Count I (the failure-to-accommodate claim).

DONE, this 27th day of November, 2012.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

---

through his declaration is admissible on the present motion.